(No. 23088.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LOUIS P. HAUCK, Plaintiff in Error.

*Opinion filed December 16, 1935—Rehearing denied Feb. 6, 1936.*

EDWARD PREE, for plaintiff in error.

OTTO KERNER, Attorney General, W. H. ABSHER, State's Attorney, and A. B. DENNIS, for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

An indictment in the circuit court of Morgan county charged Louis P. Hauck, while being an agent and clerk of the city treasurer of the city of Jacksonville, with embezzlement of, and secreting with intent to embezzle, $1154.90 of city funds. A bill of particulars was filed specifying that the funds mentioned in each count were special assessment funds and general funds of the city; that they were in or came into defendant's possession between February 28 and May 3, 1931, and that the offenses charged occurred between March 16 and September 1, 1931.

Defendant was tried by a jury. Two verdicts were returned—one finding him guilty of embezzlement and the other finding him guilty of concealing with intent to embezzle, and fixing the amount embezzled or secreted at $983.50. On motion of the State's attorney the trial court entered judgment on the verdict, finding defendant guilty of secreting with intent to embezzle, and sentenced him to the penitentiary.

Defendant was the assistant or agent of Harry K. Chenoweth, city treasurer, whose term of office expired May 1, 1931. He served in a like capacity under Chenoweth's predecessors from 1926 or 1927, and continued in the service under Chenoweth's successor, Harold C. Clem-

ent, until November, 1932. The city treasurers were usually bank employees, and defendant was intrusted with the collection and disbursement of all city funds, including special assessments. It was his duty to make deposits of the funds in the Ayers National Bank to the credit of the city treasurer and to make up his monthly reports. Chenoweth checked only the balances reported. In general, defendant managed and handled all of the work of the office. He used a card system for the recording of special assessments collected. There was an individual card for each property owner against whose property special assessments had been levied, showing the amount thereof, the number of the assessment, and other data. Payments of installments were entered on the cards, with the date of their receipt. Approximately five hundred of these cards showing payments in the month of March, 1931, and approximately one hundred more showing payments during the month of April, 1931, were admitted in evidence as People's exhibits 3 and 4. People's exhibits 1 and 2 are the reports of receipts and disbursements of the city treasurer for the months of March and April, 1931, prepared and filed with the city clerk by defendant. There is a discrepancy of $940.98 between the amount shown by the special assessment cards to have been collected and the amount reported to the city council as having been received for special assessments in April.

During the months of May, June, October, November and December, 1933, and January, May and June, 1934, the records of the city were audited by Orval Diehl, a certified public accountant. In December, 1933, and January, 1934, he audited the special assessment records of the city. These audits covered a period of several years. He made a supplemental audit for the month of April, 1931. His report showed a shortage of $1154.94 in special assessment funds for that month, and a copy was furnished the city attorney of Jacksonville. Various conferences were

thereafter held between defendant, certain public accountants, officers of the city and the State's attorney prior to the time defendant was indicted.

Some time during February, 1934, Chenoweth informed defendant the city attorney had reported to him the existence of a deficit in a special assessment account and asked him if he knew anything about it. Defendant denied any knowledge of the alleged discrepancy and agreed to check up the account. Later, at a meeting held in the jury room at the court house, Chenoweth, Diehl, the mayor, the city attorney, the State's attorney and defendant were present. The accountants had their reports, and defendant was asked if he could explain the shortages. He said he would not accept their figures and was given two weeks to make an audit. In the conversation he told Diehl the entries on the assessment cards were correct. Shortly after the meeting in the court house the city attorney and State's attorney had a conversation with defendant at the city attorney's office relative to the alleged shortage for the month of April in the special assessment records. Defendant admitted he had taken in the month of April substantially the amount shown in the supplemental audit, although he did not know whether it was exactly right. He said that as the cash and checks came in he put them into a small box, and after he had made his report he took the cash that was left in the box, put it away and used it. He took only cash. At this meeting Diehl's supplemental report was spread out on the desk and the separate months and amounts shown on page 3 were exhibited to defendant. The amount received in April was pointed out and he was asked whether he had gotten that money and if the amount was correct as shown. He said that he did not know whether it was correct but that it was substantially so and that he got the money.

By an arrangement with the city officers, Chenoweth employed Price, Waterhouse & Co. to audit the books. H. O. Fechener, of that firm, made the audit. During the

audit Fechener and defendant came to Chenoweth's office. Defendant said he could not explain some of the items on the assessment roll. Chenoweth told him that if he could not explain them there must be something wrong. Defendant said, "It looks like it." He did not tell them what the trouble was. At Chenoweth's suggestion Judge H. P. Samuell came to the office and defendant talked alone with him for some time. Fechener and Chenoweth were then called in. Defendant admitted he was entirely to blame for the shortage and that no one else was involved. He said he had been speculating, and promised restitution of a large part of the shortage. He offered to raise $35,000 or more. That evening he turned over to Chenoweth between $20,000 and $21,000 of special assessment bonds and the next morning he paid Judge Samuell $900 in cash. The following Monday a check for an amount between $15,000 and $16,000 was likewise turned over to Samuell, and on several other occasions defendant turned over to Samuell other moneys and securities but did not make full restitution. He never turned over to Chenoweth any funds, money or bonds belonging in the city treasury, other than as set forth in the various monthly reports.

Orval Diehl testified that in the audit of the records of the city of Jacksonville some eight or ten thousand separate cards, records and documents were examined. From Diehl's examination and audit he was able to state the total amount received by defendant from February 28 to May 3, 1931. The special assessment cards for the month of April, 1931, showed receipts of $25,721.82. The amount of cash reported by defendant as received during the same period was $24,780.84, leaving a discrepancy of $940.98. Upon a re-check he found that certain items of receipts shown in the supplemental report as received in April had in fact been received in March, and that those items deducted from the $1154.94 in the supplemental report reduced the shortage in the special assessment account for April to $940.98.

Clifford B. Estes, a witness for defendant, is engaged in public accounting. He testified that he made an examination of the special assessment cards of the city of Jacksonville for the months of March and April, 1931, to determine the total amount of receipts that came into the hands of defendant during that period, so as to ascertain whether or not they were deposited or accounted for. He and Diehl worked together in examining special assessment cards and in determining the amount of money coming in from all other sources to ascertain the amount deposited in the city treasurer's account during March and April. He testified there was deposited in April, 1931, $86,411.16 more than the collections for the month, including $9200 in bonds, and $75,000, an item transferred from Dunlap, Russell & Co. to the city treasurer's account in the Ayers National Bank; that by eliminating those two items he found there was $2211.16 more deposited than was called for by the assessment cards and other sources of receipts, and that during the two months of March and April he found $3742.64 deposited in excess of the receipts from all sources. He stated on cross-examination that it was impossible for him or anyone else to prove a shortage or an overage by the methods employed by the accountants, as it would be necessary to first know how much cash there was on hand. This witness did not confine himself to ascertaining whether or not there was an actual shortage in the special assessment accounts, but undertook to develop a theory that there was deposited in the bank during the months of March and April more money than was collected during that period from all sources of revenue. This is beside the mark. Defendant was admittedly many thousand dollars short in his accounts generally, and the fact that he may have deposited during a given period a little more than he received during that time would not protect him against a charge of shortage in a specific account.

The record is voluminous, and we will not undertake to discuss in detail the mass of exhibits, figures and mathematical deductions concerning which the accountants testified. That a shortage existed in the special assessment account is well established by the proof and not unequivocally denied by the defense. The substance of the testimony of the witness Estes is that his examination did not reveal whether the accounts showed an overage or a shortage. Against that are the definite statements of the accountants who testified for the People as to the fact of the shortage and its amount. Moreover, there is the proof of admissions made by defendant himself that his cards showed the true amount of his collections and that neither his report nor the bank account tallied with the cards.

It is urged that the trial court erred in admitting the confessions of defendant because there was a total failure of proof of the *corpus delicti* independent of the confessions. It is well established that while a defendant's confession, where the *corpus delicti* is not otherwise proved, is insufficient to convict, yet this does not mean that the *corpus delicti* must be proved by the evidence, aside from the confession, beyond a reasonable doubt. It is the mere naked, uncorroborated confession which is insufficient to convict. Direct and positive evidence is unnecessary to prove the *corpus delicti,* and it is not essentital that it should be established by evidence independent of that which tends to connect the accused with the crime. The same evidence which tends to prove one may also tend to prove the other, so that the existence of the crime and the guilt of the defendant may stand together on one foundation of circumstantial evidence. In this case the *corpus delicti* was amply proved. *People* v. *Hein,* 315 Ill. 76; *Gore* v. *People,* 162 id. 259.

The order in which testimony competent and relevant to the issues shall be admitted is largely in the discretion of the trial court, and a reviewing court will not reverse

because of such order of admission except in case of manifest abuse. (*People* v. *Rewland,* 335 Ill. 432; *People* v. *Byrnes,* 302 id. 407.) It is not error to allow a confession to be introduced in evidence before proof of the *corpus delicti* is made. *People* v. *Wolf,* 334 Ill. 218; *Spies* v. *People,* 122 id. 1.

The testimony of Chenoweth, Samuell, Foreman and Diehl was properly admitted, as it tended to prove the precise crime of which defendant was convicted.

It is claimed that the trial court erred in admitting People's exhibit 5, showing a discrepancy of $1154.94, because it was a conclusion of the witness as to an ultimate fact to be determined by the jury and was highly prejudicial on account of its form. When the exhibit was offered in evidence the only objection interposed to it was that the report of the auditor was incomplete and there was no sufficient foundation laid for it. In that state of the record the objection urged here will not be considered.

The court permitted the jury to take exhibit 5 to the jury room when they retired to consider of their verdict. Whether or not a writing introduced in evidence in a criminal case should be delivered to the jury to be consulted by them in the jury room rests in the sound discretion of the court, and unless we can say that such course was prejudicial to defendant the action of the trial court will not be disturbed. (*Dunn* v. *People,* 172 Ill. 582; *People* v. *Love,* 310 id. 558; *Cooke* v. *People,* 231 id. 9.) No prejudice to defendant appears from allowing the exhibit to be taken to the jury room.

Defendant was accorded a fair trial. The testimony was sufficient to support his conviction, and there is no reversible error in the record.

The judgment of the circuit court of Morgan county is affirmed.                    *Judgment affirmed.*