**People of the State of Illinois, Plaintiff-Appellee, v. Edward Thomas Aarhus, Defendant-Appellant.**

Gen. No. 69–14.

Second District.

June 30, 1969.

John T. Beynon, Public Defender, of Rockford, for appellant.

Philip G. Reinhard, State's Attorney of Winnebago County, of Rockford, and John Tower, Assistant State's Attorney, for appellee.

MR. JUSTICE SEIDENFELD delivered the opinion of the court.

Defendant appeals from a judgment of conviction of murder, and from the 14- to 20-year sentence imposed thereon, after a jury verdict.

In support of his claim of errors sufficient to require a reversal and a remand for a new trial, defendant urges that a statement of the deceased was improperly intro-

duced as a purported dying declaration, and that he was not proven guilty of murder beyond a reasonable doubt upon his introduction of evidence of justifiable use of force in self-defense. Defendant further urges that his motion for a directed verdict at the close of the People's case was improperly denied, and claims procedural errors in the order of proof.

On April 21st, 1968, Eddie Crooks appeared in the doorway of the office on his used car lot. Donald Hampton, a witness for the State, testified:

> "I noticed he hesitated for a moment, a second more or less. His face was real white. And the light reflection on his shirt, it appeared to be red. And I took it for granted at the time he had a red shirt, which I'm not sure of. But it appeared to be wet when the sun reflected on it, and he was acting kind of funny. He was standing erect, kind of stiff like, and staring right directly ahead.
>
> "He proceeded down the steps. He was putting his hands on the side of the doorway. Walked [of] stiff legged down the steps. I was still in my car at this time watching, because I thought it looked like he might be sick or something. So just as he stepped off the bottom step on a little concrete landing, his knees buckled. His knees came towards the direction I was in. He fell backwards. And his head happened to strike one of the steps. . . ."

The witness further testified that Crooks was on his back and that he went up to him, saw that there was blood all over his shirt and called for a Mr. Robbins, who was in the vicinity, to call an ambulance. However, Robbins did not seem to know what Hampton was saying, so Hampton rushed into the office and made the call while Robbins rushed over to where Eddie Crooks was lying.

Carl Robbins testified (first out of the presence of the jury, and thereafter in the jury's presence):

170

"I told him, I said, 'Just take it easy, Eddie, I got an ambulance on the way.' And he said, 'Tell them to hurry,' he said, 'I'm hurting bad,' he said, 'I don't think I'll make it this time.'

". . .

"I said, 'Who did this to you?' And he said, 'Big Ed, the mailman.' And that's all that was ever said."

Dahlin, a Rockford Police Sergeant, answered the call and arrived at the scene within two or three minutes. He testified:

"Well, I went up to the individual laying on the sidewalk with his head laying on the stoop. And I says, 'What happened'? He says, 'I've been shot.' I says, 'Where?' And he says, 'In the chest.' He had his hand on his chest.

"And I says, 'Well, take it easy,' I said, 'The ambulance is right behind me.' And I said 'Who shot you?' And he said, 'Ed Aarhus.' I said 'Who?' He said 'Big Eddy the mailman.' "

At that time two other officers arrived and he again asked Crooks, in their presence, who shot him and he answered "Eddie Aarhus, Big Eddie, the mailman." They placed the wounded man on a stretcher as the ambulance arrived and he was sent to the hospital.

Pathologist, Dr. Joseph Hosek, testified that Crooks had been pronounced dead at 10:10 p. m. on April 21st, 1968, at the hospital. In connection with the autopsy, the Doctor testified that on an external examination he found a bullet wound in the lower chest at the midline, the upper portion of the abdomen, just below the breast bone. There was a hole in the back of the heart, a hole through the lower portion of the right lung, and the bullet was found in the right lung near its outer part. The hole in the heart had been sutured and it appeared that at the time of the surgery the damaged part of the heart

171

broke open and the deceased had a massive hemorrhage, causing the heart to stop some two hours before the pronouncement of death.

It appears from the records that the deceased was brought to the hospital at 4:55 p. m., that surgery began at approximately 7:37 p. m., and that the cardiac arrest took place shortly thereafter.

It was brought out in the State's case that on the prior date of April 6th, there was a wild ride in the late night hours in which the victim, the defendant, and other persons participated. Evidence was introduced to show that the defendant threatened the victim during that ride, which culminated on a lonely country road; and that defendant, in a hiding place in the weeds by the side of the road, fired a shot at the group of persons who had followed in another car.

On cross-examination of the State's witnesses, it was developed that the wild ride was preceded by a gambling card game in a local motel in which a number of persons participated; that this was merely one of several gambling sessions and ended with the defendant demanding all of the money, using a gun and saying he had been cheated. After the defendant took all of the money from the card game, being in excess of the amount he had lost that evening, the parties left the motel and rode back together to the place where defendant left his car. At this point Eddie Crooks, the deceased, took over the driving of defendant's car and was followed by another car in which other participants of the card game rode. There was evidence of a threat to the deceased by the defendant when the car was stopped on a side street in Rockford. It was generally agreed that the defendant fled his car when it stopped out in the country, hiding in the weeds from those in the car following; and that the victim Eddie Crooks, left the Aarhus car and returned to the car in which his friends followed. There was a

discrepancy as to the number of gunshots fired at the scene, but all agreed that shots were fired.

Patricia Dunn, a "car hop" at a Drive In Restaurant located near the used car lot, saw the defendant and Crooks together at the Drive In during the afternoon of April 21st, 1968. She testified that they seemed friendly and were joking freely.

There was testimony of the officers who investigated the scene that they searched the office and desk drawers for a gun and also the area outside the building and that no weapons were found. They also examined the inside of the office building and found blood on the swivel chair behind the desk.

After his motion for a directed verdict was denied, the defendant testified. He confirmed the April 6th incident with some variations, claiming that he shot his gun up in the air when he was in the weeds and that there was a shot fired at him from the car. He denied the threat to the victim.

Defendant testified that during the next two weeks after the April 6th incident there were several threats made against him, that his house was under surveillance; and that he was followed on his mail route. He became so frightened that he fled for his safety to Wisconsin, and upon his return to Rockford and to work, the surveillance continued. On the Sunday of the shooting in question, the defendant testified that Eddie Crooks flagged him down in his car and that Crooks joined defendant and they rode around a bit and stopped at the Drive In. Defendant said he refused to accompany Crooks to meet the others, but did go with the victim to his place of business trying to learn from Crooks who was seeking to kill the defendant. The victim made two phone calls and when he reached toward a drawer in his desk where the defendant had formerly seen a gun, he testified defendant shot him with a gun he had been

carrying in a brown paper bag because he feared for his safety.

Defendant argues that it was error to admit the statement of Crooks as to who shot him, without more proof that the victim knew or thought he was dying. But the principal emphasis of defendant's argument is in the claim that the court did not rule on the trustworthiness of this statement to qualify as an exception to the hearsay rule as a matter of law, but erroneously passed that burden on to the jury.

The law with respect to dying declarations has become well settled. People v. Corder, 306 Ill 264, 275–6, 137 NE 845 (1922):

> "It is not necessary that the deceased actually be at the point of death or that the statement be made at the time deceased is breathing his last. Dying declarations are such as are made by a party relating to the facts of the injury of which he afterwards dies, under the fixed belief and moral conviction that his death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance; when he has despaired of life and looks to death as inevitable and at hand. (Starkey v. People, 17 Ill 17; People v. Buettner, 233 id. 272.) While the wounded person must think that death is due to follow immediately and that there is no hope of recovery, it is immaterial if he is mistaken in this belief and death does not follow for some time. If the declaration is made under the belief of impending death, when every hope of recovery is gone, it is competent, although contrary to his expectation he lives many days afterwards. (People v. Cassesse, 251 Ill 422; Kirkham v. People, 170 id. 9.) Whether statements made by wounded persons are dying declarations must be determined by the court upon preliminary proof, and if the proof satisfies the court, beyond

174

a reasonable doubt, that the declaration was made in extremity and was, in fact, a dying declaration, it should be admitted in evidence. (People v. White, 251 Ill 67.)"

■ The belief of a dying man and not the belief of those around him furnishes the guarantee of truthfulness that makes his dying declaration admissible. People v. Odum, 27 Ill2d 237, 244, 188 NE2d 720 (1963).

■ We believe that the trial court acted correctly. He held a hearing outside of the presence of the jury to determine the competency of the statement: "Tell them to hurry, I'm hurting bad. I don't think I'll make it this time." Under the circumstances, including the location and nature of the wound and the description of the victim's acts just prior to making this statement, the words sufficiently import the necessary belief that death was at hand, so as to import verity and trustworthiness to the victim's words, and in fact the victim died within a few hours thereafter from the wound.

■■ Defendant's argument that the court did not rule on the statement as a matter of law is not supported by the record. While the court, in ruling on the hearsay objections, said:

"That is a question for the jury to determine what he said. I'm going to admit it into evidence,"

it is clear from the context of the court's prior remarks that he would not allow the statement to go to the jury "if they (the State) can't establish it as a dying declaration, which makes it competent . . . ." When the court admitted the statement after having first held a voir dire examination of the proof outside of the presence of the jury, it is clear that the reference to the jury is to its role in determining the credibility of the witness's testimony. After the preliminary determination of the competency of a purported dying declaration, it then becomes a question for the jury to

**175**

determine as to what weight should be given to the declaration. People v. White, supra, 75 (1911).

■ Defendant makes some point in his argument that the witness, Carl Robbins, had to be refreshed by his statement before he recalled the declaration of Crooks "I don't think I'll make it." This occurred at the preliminary hearing and was brought out in the cross-examination of the witness by the defendant's attorney at the trial below. The argument goes to the credibility of the witness and not to the competency of the statement.

■ A further point is made that the document used to refresh the witness was not furnished to defendant's counsel at the preliminary hearing. However, it was furnished to him at the trial and he had the opportunity to use it if it had been impeaching, so that no prejudice is shown.

■ The defendant also argues that he was prejudiced by the fact that the State was permitted to introduce evidence in regard to the dying declaration prior to any proof that the victim died of wounds inflicted in a criminal manner. We find no merit in this contention. In a murder case the corpus delicti includes the fact of death and the fact that death was produced by the criminal agency of some person other than deceased, but it is not essential that the corpus delicti should be established by evidence independent of that which tends to connect the defendant to the crime. People v. Nachowicz, 340 Ill 480, 495, 172 NE 812 (1930). The order in which testimony shall be admitted is largely in the discretion of the trial judge. It has been held, for example, that a confession may be introduced before corpus delicti is established. People v. Hauck, 362 Ill 266, 272-3, 199 NE 821 (1936). No manifest abuse of discretion exists in this record.

■ Defendant's contention that the trial court erred in denying his motion for directed verdict at the close of the People's case has no merit. The motion was waived

176

when the defendant introduced evidence after his motion had been denied. People v. Washington, 23 Ill2d 546, 548, 179 NE2d 635 (1962); People v. Cross, 40 Ill2d 85, 90, 237 NE2d 437 (1968).

We next consider whether the defendant has been proven guilty of the crime of murder beyond a reasonable doubt in view of the evidence introduced by him in self-defense.

 Under the Criminal Code (Ill Rev Stats 1967, c 38, § 7–1), the use of force in self-defense which is likely or intended to cause death or great bodily harm is justified only when the person using said force reasonably believes that its use is necessary to prevent great bodily harm or imminent death to himself.

Defendant builds his argument that he was not proven guilty of murder beyond a reasonable doubt by a comparison of various sections of the Criminal Code (supra, §§ 9–1(a)(1), 9–2(a) and (b), 3–1, 3–2(a) and (b), 4–4, 7–1, 7–10 and 7–14), concluding:

> "In other words, it is submitted that Section 9–1 (a)(1) is delimited by Section 7–1 which is a codification of the law of self defense prior to 1961; and Section 9–2(b) is an exception to the definition of justifiable use of force. It allows the jury to decide upon the reasonableness of the belief of the defendant but only in the concept of the criminal responsibility for murder. Under the record developed in this case, there could be only one question of fact for the jury to decide—the reasonableness of the belief of the defendant. If they found it to be reasonable, it exonerates and an acquittal must result. If they found the belief unreasonable, a verdict of guilty could result but guilty of voluntary manslaughter, not of the murder charge. In this sense Section 9–2(b) becomes a defense against murder for that set of facts and circumstances weakens both

the intent and without lawful justification elements of Section 9–1(a)(1) so that they are not provable beyond a reasonable doubt."

It is true that under the Criminal Code, when the issue of self-defense is interposed by the introduction of "some evidence," the burden devolves upon the State to prove beyond a reasonable doubt that the act was criminal. However, the jury is not bound to accept defendant's exculpatory statements as true even in the absence of directly contradicting evidence by other witnesses. People v. Warren, 33 Ill2d 168, 174, 210 NE2d 507 (1965); People v. Hobbs, 35 Ill2d 263, 268–9, 220 NE2d 469 (1966).

In this case the jury was not obligated to believe the defendant's testimony that he had seen a gun in the desk drawer of the victim on a prior occasion, particularly when this was in no way corroborated and the evidence was that no gun was found in the desk drawer, or anywhere else in the office. Under the various facts and circumstances in the record, the jury could well have found that the defendant's belief that he had to shoot the victim to protect himself was unreasonable in view of all of the facts in the record, including defendant's own testimony that he was getting along with the victim on the day of the shooting and was not afraid of him. It is also in evidence that Crooks was trying to help the defendant just prior to the shooting. While defendant suggests that the circumstances support his theory of self-defense, the supporting evidence relies primarily upon his own testimony at the trial, of which the jury may always believe as much or as little as they please. People v. Warren, (supra, at p 174).

Defendant argues that the proof to support the charge of murder is weak and unsatisfactory because the "why" of the killing was not shown in the evidence. However, to justify a conviction of murder, it is not nec-

178

essary that the defendant had formed an intent to kill. It is sufficient to show "that he voluntarily and willfully committed an act, the direct and natural tendency of which was to destroy another's life." People v. Davis, 35 Ill2d 55, 61, 219 NE2d 468 (1966).

██ ██ On the conflicting evidence, it was for the jury to decide, under proper instructions, whether the homicide was murder or manslaughter, or whether it was justified under the principle of self-defense. People v. Davis, (supra, at p 61). In this case the jury was properly instructed as to the range of its verdict, and we cannot say that the determination of the jury in this regard was so unsatisfactory or improbable to justify our conclusion that the defendant was not proven guilty beyond a reasonable doubt. We believe that the evidence justifies the verdict.

We, therefore, affirm.

Affirmed.

MORAN, P. J. and DAVIS, J., concur.