THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MARC ANTHONY BELL, Defendant-Appellant.

Second District   No. 76-73

Opinion filed June 3, 1977.

Ralph Ruebner and Andrew Berman, both of State Appellate Defender's Office, of Elgin, for appellant.

Philip G. Reinhard, State's Attorney, of Rockford (Phyllis J. Perko and Barbara A. Preiner, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE BOYLE delivered the opinion of the court:
The defendant, Marc Anthony Bell, was convicted of two murders in Winnebago County, Illinois. The facts in the case are:
The defendant, Marc Anthony Bell, went to the home of his girlfriend

in Rockford in the early evening hours of November 30, 1974. The two victims, Orvis and Grebus, had been drinking throughout the afternoon and early evening of that date. They arrived at the street location where the defendant was waiting for his girlfriend with his car facing north. The victims found the defendant's car blocking the street, as there were cars parked on either side. Victim Orvis exited his automobile and came and stood in front of defendant's car, pounding on the hood and being generally abusive in his language. The defendant, however, backed up, passed around Orvis and his automobile, and proceeded in a northerly direction approximately 100 feet, at which point he parked his car, exited the car, and came back towards the victims. As the two victims advanced toward the defendant, the defendant pulled a gun and killed each of them by shots to the head.

The sister and girlfriend of the defendant testified in his behalf, and each presented a somewhat different version, in that they said that the victim, Orvis, who had pounded on the hood, had reached through the open window of the automobile and seized the defendant and tried to pull him out of the car.

The defendant's version was related to Detective Donelli at the time of his apprehension in Racine, Wisconsin, and was testified to by Donelli at trial (defendant declined to testify). Donelli said that the defendant drove around victim Orvis and had the struggle with victim Grebus. After firing warning shots, defendant shot victim Grebus and immediately thereafter was charged by victim Orvis coming northerly toward him, whereupon the defendant again fired a warning shot or shots and then fired and killed the victim, Orvis.

A neighbor testified for the State and said that she saw the defendant's car parked north of the location of the bodies and saw a man pass in front of and north of victim Orvis' car, enter the car and drive away at a high rate of speed.

It is undisputed that defendant drove to a club, had a drink, called his girlfriend and was driven to his home by a third party, and then was taken by his mother to Racine, Wisconsin, where he was apprehended and questioned as indicated by Detective Donelli, at which time he gave the statement herein referred to.

Defendant's version asserts that he merely resisted the two victims, who were admittedly physically larger, but unarmed, and that he should be found guilty of manslaughter, but not guilty of murder. Donelli testified that defendant said he had thrown the automatic pistol used in the incident, in a lake in Wisconsin. The defendant disavows the testimony of his girlfriend and his sister as being "incredible," although they were called and testified in his behalf and were the sole surviving witnesses to the incident other than the defendant himself.

After the close of the testimony, a motion for a directed verdict was made and same was denied. The case was argued at considerable length by both the assistant state's attorney and the assistant public defender, and the jury returned a verdict of guilty on both charges of murder.

■■ Defendant contends that his guilt was not proved beyond a reasonable doubt. We disagree with defendant's· contention. The jury heard and observed the witness' testimony and the arguments thereon.

> "It is the province of the trier of fact to settle conflicts in evidence and to determine * * * whether the circumstances attending the assault were such that the death at defendant's hands constituted murder, manslaughter or justifiable homicide. (*People v. Brumbeloe*, 97 Ill. App. 2d 370, 240 N.E.2d 150. * * *" *People v. Kendricks* (1972), 4 Ill. App. 3d 1029, 1033, 283 N.E.2d 273, 276.

It is noted that the eyewitness, Patricia Struthers, who observed the defendant leave the area, directly contradicted defendant's version of the placement of the cars. Ms. Struthers testified that the person who drove defendant's car away walked in front of the headlights. From her point of observation, Ms. Struthers could have seen the person who drove defendant's car away only if that car were north of victim Grebus' car. The jury may well have concluded that the defendant had removed himself from the area of danger of assault to his person at the hands of the two unarmed and partially intoxicated victims and then stopped his car and returned to the location of the victims.

■■ The defendant takes the position that since his version of the incident is "not improbable, nor uncorroborated, nor contradicted in its material parts," it may not be disregarded by the jury. (*People v. Jordan* (1954), 4 Ill. 2d 155, 163, 122 N.E.2d 209, 213.) It is also true, however, that the jury is not compelled to accept the defendant's version of the homicide as conclusive. The surrounding circumstances and the probability or improbability of the defendant's story must also be considered. (*People v. Wiggins* (1957), 12 Ill. 2d 418, 147 N.E.2d 80.) The jury is not bound to accept the defendant's exculpatory statement as true, even in the absence of directly contradicting evidence by other witnesses. (*People v. Aarhus* (1969), 111 Ill. App. 2d 167, 248 N.E.2d 820.) In taking into consideration whether the defendant's version of the incident is probable or improbable and whether that version conforms to the surrounding circumstances of the case, it may well be that the defendant's version was rejected by the jury after considering the surrounding circumstances. Those circumstances were the fact that the defendant immediately fled from the scene at a high rate of speed, took himself to a club where he had one or more drinks, called his girlfriend, who had left his automobile during the shooting, gave the gun to a friend to keep temporarily, gave his automobile to another person to drive to his home,

sought a ride with a third party to go to his home, from which location he was taken by his mother and secreted in a cousin's house for two days and then driven over the state line to Racine, Wisconsin, where he threw the automatic pistol into a lake.

There is no showing in the record whether or not defendant had any prior knowledge as to what the testimony of his girlfriend or his sister would be. It stands to reason, however, that defendant thought that their testimony would be beneficial to him, otherwise, he would not have called them as witnesses on his behalf. Defendant now says that their testimony was so incredible that it highlighted or heightened his decision not to testify, because it did not comport with the version given by defendant to Detective Donelli, which was placed in evidence.

■█ █ We find no merit to this contention. The jury heard the evidence, observed the witnesses and had the entire case for consideration. (*People v. Lobb* (1959), 17 Ill. 2d 287, 161 N.E.2d 325; *People v. Milone* (1976), 43 Ill. App. 3d 385, 356 N.E.2d 1350.) We find that the defendant was proved guilty of murder of both decedents beyond a reasonable doubt.

The defendant secondly contends that his right to represent himself was violated by the trial judge's refusal to allow him to discharge the assistant public defender and permit the defendant to undertake his own defense in the middle of the trial. The defendant places entire reliance on the case of *Faretta v. California* (1975), 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525, which stands for the proposition that a criminal defendant has a sixth amendment constitutional right to represent himself. This case was decided after the verdict of guilty in the instant case, but prior to the post-trial motions and sentencing. It should be noted that the request to represent himself was first made by the defendant on the second day of trial after some seven witnesses had testified for the State. Some serious disagreement had arisen between the defendant and the public defender over admissibility of evidence which was clearly inadmissible and which the public defender had advised him was inadmissible at a hearing in chambers. At that point in the trial, the defendant asked for a continuance to obtain other counsel and stated that his mother was obtaining such counsel and that he wished to fire the assistant public defender. The trial judge responded to the defendant that he had several times asked for continuances in order to obtain other counsel, but that he had never had counsel come in to the case. The trial judge further stated that if defendant's mother were successful in obtaining counsel, that he (the judge) would permit such counsel to act. However, the judge stated he would not permit the defendant to fire the assistant public defender and was insisting that the public defender be retained in a standby capacity if

other counsel were obtained. In no event would the judge permit the defendant to cause a mistrial or to delay the in-progress trial, which was entering its second day of testimony and third day of trial (including the voir dire examination by the assistant public defender).

The chronology of the case would indicate that there had been some differences between the defendant and the assistant public defender at prior times in the pretrial stages. On the occasions of this difficulty, the defendant each time had asked that he be given leave to obtain counsel other than the public defender, but as stated by the court, he never produced any additional lawyer, and, apparently, the matter was not a grievous one until the difficulty arose over the effort of the defendant to have testimony adduced, which the public defender had stated was inadmissible.

Defendant asserts on appeal that he asked to represent himself by way of the following dialogue which occurred mid-way in the trial:

"THE COURT: That's all we're going to talk about. You're making the decision to discharge your lawyer.

THE DEFENDANT: Yes, sir.

THE COURT: All right. Does that mean you want to conduct your own defense in this case?

THE DEFENDANT: Yes, sir.

THE COURT: This trial is going to continue now with this jury.

THE DEFENDANT: I would like to make a statement. My mother is contacting a lawyer right after she left the courtroom. She is going to come back with a lawyer.

THE COURT: If another lawyer comes in and wants to represent you he'll have a perfect right to sit in the courtroom, but the trial is going to continue and this jury is going to decide the case. Get that through your head."

■■ This was not a request to represent himself by defendant since he told the court his mother was going to come back with a lawyer. It is amply demonstrated throughout the record that the defendant made no effort to represent himself until the post-trial phases of the case when *Faretta* had just been decided.

The *Faretta* case simply does not apply to the facts in the within case. In *Faretta*, the request to represent himself was made at the very outset of the case and the court subsequently conducted an examination of Faretta to determine whether he sufficiently understood legal principles and strategy to act in a competent manner in the conduct of his own trial. After such hearing, the court refused Faretta the right of self-representation, and the Supreme Court of the United States reversed same. *Faretta* has been construed in *People v. Windham* (1977), ___ Cal.

3d ____, 560 P.2d 1187, 137 Cal. Rptr. 8, where the California Supreme Court held that once the trial of a criminal defendant has commenced and defendant thereupon elects to proceed to trial acting in his own behalf and without the counsel who has acted up to that point in his behalf, it is within the sound discretion of the trial court to determine whether such defendant may dismiss counsel and proceed pro se.

In *Unitied States v. Denno* (2d Cir. 1965), 348 F.2d 12, *cert. denied* (1966), 384 U.S. 1007, 16 L. Ed. 2d 1020, 86 S. Ct. 1950, the United States court of appeals held that the right of a defendant to represent himself is unqualified if invoked prior to the start of trial. However, once the trial has begun with the defendant being represented by counsel, his right to discharge his lawyer and to represent himself is sharply curtailed. There must be a showing that the prejudice to the legitimate interests of the defendant overbalances the potential disruption of proceedings already in progress, with considerable weight being given to the trial judge's assessment of this balance. *Denno* has been interpreted as holding that the reason for the request, the quality of the counsel representing the party, and the party's prior proclivity to substitute counsel are all appropriate criteria to be factored into the balance. *United States v. Catino* (2d Cir. 1968), 403 F.2d 491, *cert. denied* (1969), 394 U.S. 1003, 22 L. Ed. 2d 780, 89 S. Ct. 1598.

In the instant case, the defense provided by the assistant public defender was in all respects of the very highest order. As defendant's attorney, the public defender, made the usual pretrial motions in great detail, conducted voir dire into the background of the jurors sought to be impaneled and conducted vigorous cross-examination of the seven witnesses who had testified while the defendant was still in the courtroom. Defendant then attempted to fire the public defender. When the trial judge refused this request, defendant refused to re-enter the courtroom. Thereafter, the public defender conducted the defense without the aid of the defendant. He cross-examined to the full extent merited by the nature of the testimony, he objected to testimony that was adduced by the State, he made a motion for directed verdict, and he made an excellent argument on behalf of the defendant. No more than this could be asked of any lawyer.

■■■ It goes without saying that a criminal defendant will not be permitted to interrupt a trial in progress for the purpose of changing counsel or representing himself and cause a mistrial and the resummoning of the witnesses who have been called and have testified on behalf of either side. The trial judge, each morning of the instant trial, called the defendant into chambers and told him that he felt his place was in the courtroom and that he should cooperate in all manner with his counsel.

The defendant, on each occasion, refused to do this and asked to be taken back to a detaining room a short distance from the courtroom. Several times a day the public defender made an effort to consult and confer with the defendant in this detention area. On most occasions, these attempts were fruitless. Accordingly, we hold that both the public defender and the trial judge extended every possible effort to insure that the defendant obtained a fair trial, and an examination of the record convinces us that he did receive a fair trial. In addition, we hold that the defendant was not deprived of a constitutional right to represent himself.

■■ Lastly, the defendant asserts that the imposition of two concurrent 40-60-year sentences was excessive and should be reduced. In support of this position, the defendant cites his age of 19 years, his lack of prior criminal record and the nature of this offense as mitigating factors. Defendant further asserts that imposition of the minimum sentence of 14 years would assist his rehabilitation. Throughout this assertion, it is apparent that the defendant is arguing in a dual chain. He is actually arguing that he should be sentenced on the manslaughter charge, as his arguments in chief repeatedly set forth. Obviously, this position is without merit, as no trial court can arbitrarily make a sentencing which would conform to a crime other than that which the jury convicted the defendant by its verdict. The trial judge had the opportunity to hear all of the evidence in the case from its beginning to its conclusion. Additionally, the trial judge had an unusual opportunity to observe the defendant, to confer with him, to warn him, to admonish him, to advise him, and the record is most replete with these conferences and meetings between the judge and the defendant. Certainly the court was able to make assessments and conclusions about the nature of the offense and the disposition and attitudes of the defendant through these numerous contacts, all of which was amplified by a full and complete presentence investigation, which the court had before it at the time of sentencing. The judge imposed the sentences and, considering the nature of the two murders of which the defendant stands convicted, was in a better position to assess sentence than would this reviewing tribunal.

In one of the earliest cases on sentence reduction, the Illinois Supreme Court stated,

> " * * * such authority should be applied with considerable caution and circumspection, for the trial judge ordinarily has a superior opportunity in the course of the trial and the hearing in aggravation and mitigation to make a sound determination concerning the punishment to be imposed * * *." *People v. Taylor* (1965), 33 Ill. 2d 417, 424, 211 N.E.2d 673, 677.

It is also true that the trial court with all of the facts before it with an

opportunity to observe the defendant firsthand, is in a better position to determine a proper sentence than the reviewing court. *People v. Hampton* (1969), 44 Ill. 2d 41, 253 N.E.2d 385.

Therefore, we do not find the sentences to be excessive under the facts of this case.

Judgment affirmed.

SEIDENFELD, P. J., and WOODWARD, J., concur.