THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PABLO TORRES, Defendant-Appellant.
Second District    No. 2—92—0741

Opinion filed November 19, 1993.—Rehearing denied January 4, 1994.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Robert J. Biderman, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

Defendant, Pablo Torres, appeals the order of the circuit court of Lake County convicting him of armed violence (Ill. Rev. Stat. 1991, ch. 38, par. 12—4(a) (now codified, as amended, at 720 ILCS 5/12—4(a) (West 1992))). The court sentenced defendant to 10 years' imprisonment upon his plea of guilty after a partial trial. Defendant's appeal sounds in ineffective assistance of counsel. He contends that trial counsel's failure to notify the court of defendant's desire to obtain different counsel denied him a fair trial and undermined the voluntariness of the plea. For the following reasons, we affirm.

Defendant was charged by indictment with attempt (first degree murder), armed robbery, armed violence, and two counts of aggravated battery for his involvement in an incident at the Burger King at 1520 S. Lake (Hwy. 45), Mundelein, Illinois, on November 10, 1991. He was represented at trial by Public Defender Arthur Kessler.

Before commencing a bench trial in this case, the trial judge admonished defendant and obtained a jury waiver. Each side then presented an opening statement. The State's opening fairly paralleled the testimony later elicited. Kessler's opening established that the theory

of his case would be defense of another and self-defense, and perhaps provocation.

Before the first witness was sworn, the State informed the court that in the capacity of public defender, Kessler had represented the victim, Kurt Albeck, some years prior to the instant case in a trespass action. The State informed the court that it had discussed the matter with Albeck and moved to quash an outstanding warrant so that Kessler clearly was no longer Albeck's attorney. Kessler informed the court that he had merely stepped up for Albeck and had no conferences with him that he could recall. He stated that "outside of the plea, I had no discussion with Mr. Albeck. I know nothing about his background except for what was in the police report."

The court then asked defendant whether he had understood the discussion, and defendant responded affirmatively. The judge explained to defendant that Kessler had presented a plea for Albeck 2½ years prior. In this context the judge asked defendant, "Are you comfortable with him representing you in this case today?" Again defendant responded affirmatively, and the proofs began.

The State presented four eyewitnesses and an investigating officer, interrupted by one witness for the defense whose testimony was heard out of order due to time constraints. The victim, Kurt Albeck, testified that upon entering the Burger King he proceeded directly to the rest room, which was locked. He waited and entered after the occupant, defendant's minor brother (Gabriel Torres, processed as a juvenile; hereinafter, Torres) exited. Albeck testified that as he entered the rest room Torres stared at him, and when Albeck exited the rest room, Torres asked, "What are you looking at?" and then kicked him in the abdomen. Albeck asked Torres, "What are you? Loco? [Spanish for 'crazy']," and George Pierce (codefendant, tried separately) intervened, telling Torres to knock it off. Albeck then proceeded to the counter to place his order.

Albeck testified that he observed Torres leave the restaurant abruptly and immediately thereafter defendant entered, accompanied by Torres, Pierce, and a woman. According to Albeck, defendant asked him whether he had a problem and then struck him in the face. Albeck then asked nearby Burger King employees whether they had seen what had transpired and told them to call the police. Defendant then struck Albeck about the abdomen, chest and face and forced him into the vestibule of the restaurant and then out the door. He testified that defendant and his brother held his clothing while kicking and punching his body. They pulled his jacket up over his head and arms

and then off, and his gold chain was torn from his neck. The parties stipulated that the chain was recovered from Torres upon his arrest.

Outside the restaurant, Albeck testified, Torres threw the jacket at Albeck, and defendant said, "Kill the mother f*****. Kill the mother f*****. Stab him. Stab him." Reaching into his pocket, Pierce ran toward Albeck and said, "I am going to kill you, boy." Albeck turned and ran into traffic, pursued by Torres, Pierce and defendant. Halfway across the highway, when Albeck turned around, Pierce stabbed him in the chest. Albeck ran back toward the Burger King, pursued by the three men. He fell to the pavement as Pierce stabbed him in the back, and Pierce stepped on Albeck's leg and fell on top of him. Albeck then got up and ran into the Burger King, still pursued by the three men. He demanded that the employees call the police, and then he went outside to await assistance. Albeck was taken to the hospital and treated for a punctured and collapsed lung.

Throughout Albeck's testimony Kessler made numerous often tenacious objections to hearsay, leading questions, characterizations, questions "asked and answered," conclusory and nonresponsive answers, and other relevant matters. On cross-examination Kessler attempted to establish that Albeck had initiated contact with Torres by telling him to mind his own business and stating that he knew Tae Kwon Do and had a tattoo. Albeck denied knowing Tae Kwon Do and stated that although he had a panther tattoo, he had said nothing of it to Torres. Kessler attempted to establish that Albeck had kicked Torres and ran to the counter to tell employees that someone had started a fire in the restaurant. Albeck denied these allegations. Kessler attempted to demonstrate prejudice against Hispanics based on Albeck's use of the term "loco."

He attempted to establish that Albeck had forced his way into the vestibule to initiate contact with defendant and that he had attacked defendant and the others with racist epithets and vulgar denigrations. All of this Albeck denied. Kessler attempted to establish that Albeck fought the three men and that when he turned around in the middle of the street, Albeck meant to attack Pierce. Kessler attempted to discredit Albeck by eliciting names of other places to which Albeck could have run (when Albeck had said there was nowhere to run), and by inquiring into whether Albeck had told investigating officers the whole truth.

The State's next witness, Carolina Portillo, testified that on the evening of November 10, 1991, while she was working at Burger King in Mundelein, Albeck asked her to call the police because there was trouble in the back area of the restaurant. She testified that she

hesitated a few minutes because she did not want trouble, but when Pierce and Torres began yelling and swearing in Spanish, she phoned the police. She corroborated Albeck's testimony that he stated he did not want trouble; that Torres left the restaurant; and that he returned promptly in the company of defendant, Pierce, and Eloisa Torres, sister of Torres and defendant. She testified that defendant struck Albeck in the face, and that defendant, Pierce, and Torres began kicking Albeck, dragging him from the restaurant. She testified that the three chased Albeck outside and that when he came back inside, Albeck's shirt and jacket were missing and he had blood on his stomach. She then called the police a second time. She testified that she is Hispanic and that she never heard Albeck make any racist remarks that evening.

Again, during direct examination Kessler made timely and appropriate objections to leading questions, characterizations, etc. On cross-examination Kessler again attempted to establish that Albeck had told Portillo that someone had started a fire in the back of the restaurant. He attempted to impeach her with inconsistencies between her testimony and her statement to police at the scene. Finally, he established through her that defendant had not verbally threatened Albeck in her presence.

Next, Kessler called Sheriff Mike Trudeau, questioning him out of order as part of defendant's case in chief. Trudeau testified that in 1989, while he was employed as a security guard, he encountered Albeck outside a nearby tavern. He asked Albeck to leave, because he was unruly. Albeck shoved Trudeau, and Trudeau arrested him for criminal trespass. The State briefly cross-examined Trudeau and then called its next witness.

The testimony of Elizabeth Arias and Evelyn Escobar substantially corroborated that of Carolina Portillo. These women testified that on the evening of November 10, 1991, while they were working at the Burger King in Mundelein, they observed the same incident Portillo observed. Their versions of the events paralleled Portillo's with little variation. Again, Kessler objected promptly to leading and other inappropriate questions and cross-examined meaningfully and with direction. On cross-examination of Arias he established that when Albeck returned to the restaurant, he did not step all the way in. On cross-examination of Escobar, he established the witness never saw a knife and never heard defendant threaten Albeck. Next, the parties stipulated to the contents of Albeck's medical records and to the fact that codefendant Pierce gave a "Mirandized" statement to police.

Finally, the State called Sergeant Keith Kalodimos, who testified that on the night in question Pierce stated that he had stabbed Albeck in the ribs and identified a certain knife as the weapon he used. On cross-examination, Kessler had Kalodimos measure the knife and established that the blade was one-sixteenth of an inch less than three inches in length.

The court then permitted Kessler to conduct a limited direct examination of Kalodimos, to avoid recalling the witness. Kalodimos testified that Pierce stated, "I f***** up, I did the crime, I'll do the time."

The State rested, and Kessler moved for a directed finding, arguing specific points of missing evidence as to all counts, attacking Albeck's credibility, and asserting that the Burger King employees contradicted each other. The court directed a finding as to armed robbery, but not as to the other charges.

During a recess Kessler conferred with defendant and with the State. He then informed the court that defendant would change his plea to guilty of armed violence in exchange for the State dropping the other charges. When the proceedings resumed, the court admonished the defendant in accordance with Supreme Court Rule 402 (134 Ill. 2d R. 402). The court explained to defendant that if he in fact pleaded guilty to the Class X felony, he might be eligible for a 6- to 30-year sentence. The court added that it intended to sentence him to no more than 17 years, nor to a longer term than that received by codefendant Pierce. Defendant answered that he understood and that he wanted to plead guilty to armed violence.

The court explained to defendant that by pleading guilty he gave up the right to present witnesses, and defendant said he understood. He answered that no one had threatened him or made him any promises outside the plea negotiation in regard to his plea. The court noted that defendant had consulted with counsel for nearly an hour in this regard and had spoken with his wife. Defendant answered that he did consider it in his best interests to plead guilty. The court then accepted the plea and informed defendant of the manner and limited circumstances whereby he could withdraw the plea.

From jail that afternoon defendant wrote to the judge that he did not understand the proceedings and wanted to change his plea. This communication was later termed a *pro se* petition to withdraw the plea and vacate the judgment, pursuant to Supreme Court Rule 604(d) (134 Ill. 2d R. 604(d)). Defendant then moved to substitute counsel in order to file a Rule 604(d) motion. He sought to replace Kessler with

attorney Jed Stone. The court denied the substitution of counsel, but allowed Stone to file an appearance as additional counsel.

Defendant then filed an amended Rule 604(d) motion, along with affidavits to the effect that defendant does not understand English and did not understand his plea and that trial counsel had proceeded in spite of a conflict of interest. This motion alleged that Kessler's representation of Albeck had involved more contact than previously had been related in court. For the hearing on this motion defendant was accompanied by an interpreter. The court questioned the necessity of the interpreter, and counsel informed the court that defendant does not understand English sufficiently to communicate. The trial judge replied, "This is an interesting revelation to the Court as I have spoken with him in English fluently on many occasions." Counsel pressed the matter, and the court responded, "I will let you proceed in that way based upon those representations. I just didn't want to waste everybody's time with the facade."

At this hearing, the State presented testimony of pre-sentence investigator Louis Archibold (the drafter of defendant's presentence report) and probation officer Terrance Barrett. Each testified that during the time he had worked with defendant he never had any language difficulty with defendant. Kessler then testified that during his representation of defendant no language problems arose. He further testified that he told defendant of his prior contact with Albeck, which had been minimal, and that he told defendant he knew of Albeck's history of violence because he had represented him previously. He testified that defendant had at some point told him that he wanted a "real lawyer," and that he had told defendant that the judge would not allow it so late, so he should plead guilty or proceed with the trial.

Defendant then testified that he does not understand English; that he answered "yes" repeatedly because Kessler told him to; that he did not know Kessler had represented Albeck; and that before pleading guilty he had told Kessler he wanted another lawyer. He also testified that he did not understand the proceedings of the motion hearing.

Denying the motion, the court held that "defendant's argument about not understanding English is fantasy." The court stated, "It is clear to me that the defendant is lying about his understanding of the English language, and this causes me great concern as to his other allegations *** especially in light of his allegations against Mr. Kessler." The court also found no conflict of interest because Kessler's representation of Albeck had terminated.

At sentencing, defendant moved the court to reconsider his Rule 604(d) motion, filing more affidavits purporting to further evince his inability to understand English. The court denied the motion to reconsider (twice, it seems, for counsel persisted in arguing after the motion was denied) and proceeded with sentencing, imposing a term of 10 years' imprisonment. This appeal followed.

Defendant contends on appeal that Kessler's failure to notify the court of his desire to obtain different counsel amounted to ineffective assistance and undermined the voluntariness of his plea. We note initially that issues not raised in the motion to withdraw a plea of guilty are waived on appeal. (134 Ill. 2d R. 604(d).) Even constitutional questions not preserved in the trial court are waived on review. *Sheldon v. Edgar* (1985), 131 Ill. App. 3d 489, 495.

■ Where defense counsel raises the issue in oral argument on the motion, the issue is not "raised for the first time on appeal" and may be considered by the reviewing court. (*People v. Thomas* (1993), 246 Ill. App. 3d 708, 715; see also *Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 500.) Defendant incorrectly asserts that counsel argued this point at the motion hearing. In fact, counsel was not arguing at that point but was repeating to the court a question asked by the defendant. Nevertheless, the waiver doctrine is an admonition to the parties and is not a limitation on the jurisdiction of the reviewing court. (*Schutzenhofer v. Granite City Steel Co.* (1982), 93 Ill. 2d 208, 211; see also *Bieles v. Ables* (1992), 234 Ill. App. 3d 269, 271.) We therefore choose to address the merits of this appeal, notwithstanding the waiver.

To establish a claim of ineffective assistance of counsel a defendant must show that counsel's performance was deficient and that the deficiency prejudiced him. (*Strickland v. Washington* (1984), 466 U.S. 668, 697, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069, adopted in *People v. Albanese* (1984), 104 Ill. 2d 504.) To satisfy the deficiency component a defendant must prove that counsel's representation fell below an objective standard of reasonableness. (*People v. Johnson* (1993), 154 Ill. 2d 356, 369.) To satisfy the prejudice component of the *Strickland* test, a defendant challenging counsel's conduct with regard to a guilty plea must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Hill v. Lockhart* (1985), 474 U.S. 52, 59, 88 L. Ed. 2d 203, 210, 106 S. Ct. 366, 370; see also *People v. Jones* (1991), 144 Ill. 2d 242; *People v. Huante* (1991), 143 Ill. 2d 61.

The only error defendant alleges on appeal is Kessler's failure to inform the court that he wished to substitute counsel. Thus, to prove prejudice defendant must establish that, had Kessler so informed the court, things would have been so different that defendant would not have pled guilty and would have insisted on going to trial. Thus he must establish that the court would have allowed him to substitute counsel. This he has failed to do.

■ The right to counsel guaranteed by the sixth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VI, XIV) and by article I, section 8, of the Illinois Constitution (Ill. Const. 1970, art. I, §8) has been interpreted to include a limited right to counsel of choice. (*Wheat v. United States* (1988), 486 U.S. 153, 100 L. Ed. 2d 140, 108 S. Ct. 1692.) The right to choose counsel is particularly limited where substitution would delay or impede the effective administration of justice. (*People v. West* (1990), 137 Ill. 2d 558, 588.) This court has held that a criminal defendant may not interrupt a trial in progress to substitute counsel or to represent himself, causing a mistrial and necessitating the recall of witnesses who have testified for either side. (*People v. Bell* (1977), 49 Ill. App. 3d 140, 146.) A defendant may not discharge or substitute counsel for cause where doing so prejudices the State or interferes with the administration of justice. *People v. Mueller* (1954), 2 Ill. 2d 311, 316; see also *People v. Terry* (1988), 177 Ill. App. 3d 185, 191 (trial court properly denied motion to substitute counsel made on day of trial); *People v. Free* (1983), 112 Ill. App. 3d 449, 454 (trial court properly denied motion to substitute counsel made on day of trial); *People v. Tucker* (1981), 99 Ill. App. 3d 606, 611 (trial court properly denied motion to substitute counsel made three days before trial); *People v. Slaughter* (1980), 84 Ill. App. 3d 88, 93 (trial court properly denied motion to substitute counsel made at close of State's case).

■ In this case, the State had presented all its evidence and the defense had presented two witnesses when defendant told counsel he wanted a "real lawyer." The parties were clearly in the middle, if not near the end, of the trial. Kessler had conducted lucid cross-examination and had made appropriate objections, had presented two witnesses, and had obtained a directed verdict as to one out of five counts. Furthermore, when defendant moved to substitute as counsel for presentation of the amended Rule 604(d) motion, the court denied the substitution, asserting that if the motion succeeded, the trial would resume rather than begin again. The court told Stone:

"The problem I have with you substituting generally at this time is that the trial has been conducted halfway anyway; and

if in fact his motion was allowed, I want to just continue the trial. \*\*\* I don't know if you'd be in a position to do that. You could appear as additional counsel if you want to do that; but right now I'm not in a position to release the Public Defender's Office \*\*\*. I would suggest if the motion is granted, I would just continue the bench trial. I don't think it would be fair to the State to have to go through all their evidence at this time \*\*\*."

Upon these facts it is clear that the trial court would not have allowed defendant to substitute counsel at the time he told Kessler he wanted a "real lawyer." The trial was at least half over, and Kessler's performance had been exemplary. Thus, no prejudice inured to defendant by Kessler's failure to inform the court.

Where the defendant fails to prove prejudice, the reviewing court need not determine whether counsel's performance constituted less than reasonable assistance. (*Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *People v. Flores* (1992), 153 Ill. 2d 264, 284.) Thus, we do not reach the question whether Kessler's failure to notify the court of defendant's desire to substitute counsel constituted error. We note, however, for practicality, that a criminal defense attorney should notify the court when a client informs him or her during trial of a desire to substitute counsel, regardless of the likelihood that substitution will be disallowed.

In affirming the trial court's decision we note that, in an apparent effort to make the State's case appear less damning than it is, defendant's appellate brief gives an incomplete statement of the facts, in derogation of Supreme Court Rule 341(e)(6) (134 Ill. 2d R. 341(e)(6)).

We find that defendant has failed to satisfy the prejudice component of the *Strickland* test and thus has failed to prove ineffective assistance of counsel.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

McLAREN and QUETSCH, JJ., concur.